United States District Court
Southern District of Texas
**ENTERED**
October 01, 2026
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

| | | |
|---|---|---|
| **LEXISS AGREDANO, INDIVIDUALLY AND ON BEHALF OF HER UNBORN CHILD,** | § | |
| **Plaintiff,** | § | |
| **V.** | § | **CIVIL ACTION NO. 5:25-CV-00128** |
| **ORLANDO RODRIGUEZ,** | § | |
| **Defendant.** | § | |

**ORDER**

Before the Court is Defendant Officer Orlando Rodriguez's Motion to Dismiss Plaintiff's First Amended Complaint, (Dkt. No. 22), Plaintiff Lexiss Agredano's request for leave to file late supplemental briefing, (Dkt. No. 20), and Agredano's request for leave to amend her complaint, (Dkt. No. 40). Agredano, both individually and on behalf of her Unborn Child, brings this action under 42 U.S.C. § 1983 against Officer Rodriguez, an officer in the Laredo Police Department. (Dkt. No. 20). Agredano alleges, *inter alia*, that Officer Rodriguez unlawfully arrested her and used excessive force in violation of the Fourth Amendment. (*Id.* at 6–8).[1] Agredano also claims that Officer Rodriguez was deliberately indifferent to her medical needs, which violated her due process rights under the Fourteenth Amendment. (*Id.* at 9). Finally, Agredano brings a wrongful death claim for the loss of her unborn child, seeking recovery for her injuries and damages, alleging that Officer Rodriguez's excessive use of force caused the loss of her pregnancy. (*Id.* at 10).

Officer Rodriguez moves to dismiss Agredano's claims under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. (Dkt. No. 22).[2] Officer Rodriguez also argues that he

[1] When citing to the page numbers of any document in the record, the Court will cite to the page numbering of the Court's internal CM/ECF docket system, and not to the page numbers in the underlying documents.

[2] Officer Rodriguez also moved to dismiss the wrongful death claim under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction because Agredano's original complaint pleaded the wrongful death

is entitled to the protection of qualified immunity on all four claims. (*Id.*). Having considered the parties' briefing, counsel's arguments, and the applicable law, Officer Rodriguez's motion to dismiss will be granted in part and denied in part for the reasons explained below**.**

## I. BACKGROUND

### A. Factual Background

The following facts are taken from Agredano's Amended Complaint and exhibits referred to therein.[3] These facts asserted by Agredano are accepted as true and considered in the light most favorable to her. On the evening of August 15, 2023, a dispute over personal property unfolded outside Agredano's residence between her and her ex-boyfriend Joseph Alegria. (Dkt. No. 20 at 2). Agredano and Alegria both accused the other of withholding personal property from the other. (*Id.* at 3). Officer Orlando Rodriguez responded to the scene at approximately 10:14 p.m., after receiving a complaint from Alegria. (Dkt. Nos. 20 at 2; 5–1 at 22:16:50 CDT).[4]

Agredano and Alegria had been in a relationship for some time, sharing a child

claim as a state law claim, which may have been barred under election of remedies. (Dkt. No. 22 at 19–23; Dkt. No. 1 at 9). Agredano has since amended her complaint and no longer presents her wrongful death claim as a state law claim. (Dkt. No. 20 at 10). A plaintiff is considered "the master of the complaint" and an amended complaint supersedes the old one. *Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 35 (2025).

[3] The Court also references a transcript of Officer Rodriguez's body camera footage, translating the conversations into English from the body camera footage that is partially in Spanish. (Dkt. No. 35–1). While Agredano does not refer to this transcript in her Amended Complaint, she does reference the video conversations partially in Spanish. The Court references the English translation to establish the facts referred to by Agredano in English. Agredano filed an advisory informing the Court she had reviewed the transcription and translation of Officer Rodriguez's body camera footage and has no objections or proposed corrections. (Dkt. No. 37).

[4] While the Court accepts all facts pleaded in the complaint as true in evaluating a motion to dismiss, the Court may review video recordings if they are included in the pleadings or if they are referred to in the plaintiff's complaint and are central to the claim. *See Terrell v. Town of Woodworth*, No. 23-30510, 2024 WL 667690, at *5 (5th Cir. Feb. 19, 2024). The video depictions of events, viewed in the light most favorable to the plaintiff, should be adopted over the factual allegations in the complaint if the video "blatantly contradict[s]" those allegations. *Harmon v. City of Arlington*, Tex., 16 F.4th 1159, 1163 (5th Cir. 2021) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007). Agredano's complaint references Officer Rodriguez's body camera video throughout, and it is central to her claims. Therefore, the Court will consider Officer Rodriguez's body camera video. (Dkt. No. 5-1). Agredano also references Officer Rodriguez's body camera video in her Amended Complaint, incorporating it by reference as an exhibit the Court may review. *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1176 (5th Cir. 2006) ("The Federal Rules of Civil Procedure specifically allow for incorporation by reference in supplemental pleadings. Rule 10(c) reads: 'Statements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion.'").

together. (Dkt. Nos. 5-1 at 22:25:20–22:26:23 CDT; 35-1 at 14–15). Agredano and Alegria had recently broken up, and Alegria went to Agredano's house the previous day to collect his belongings. (Dkt. Nos. 20 at 2; 5-1 at 22:18:02–22:18:14 CDT). Alegria occasionally stayed at Agredano's house before their break-up, but he primarily lived with his grandmother. (Dkt. Nos. 20 at 2; 5-1 at 22:17:46–22:17:54 CDT). Alegria returned to Agredano's residence on the evening of August 15, 2023, claiming that Agredano still had a pair of his sneakers. (Dkt. No. 5-1 at 22:17:07–22:17:19). Meanwhile, Agredano also claimed that Alegria had not returned a phone belonging to her cousin, which was lent to Alegria after he broke his own phone. (Dkt. Nos. 20 at 2; 5–1 at 22:21:00–22:21:13). Alegria refused to return the phone because he had broken it and thrown it away. (Dkt. No. 5-1 at 22:21:00–22:21:13; 35-1 at 7–8).

Officer Rodriguez interviewed Alegria and his sister. (Dkt. No. 5-1 at 22:22:46). Alegria and his sister described various interactions they had with Agredano. (*Id*. at 22:22:48–22:23:16). Alegria said that Agredano arrived at his grandmother's house and threatened to fight. (*Id.*; Dkt. No. 35-1 at 10). Allegria also said that Agredano threatened to sell his cap, gown, and shoes. (Dkt. Nos. 5-1 at 22:23:07–22:23:15 CDT; 35–1 at 11).

Agredano denied ever sending those threats to Alegria or having Alegria's shoes, instead suggesting that Alegria had sent her messages saying that his sisters would beat her up. (Dkt. Nos. 5-1 at 22:24:41–22:24:52 CDT; 35-1 at 13). To support her account, she pulled up video footage from her home cameras showing Alegria retrieving his belongings the day before. (Dkt. No. 5-1 at 22:26:26–22:26:55 CDT). Officer Rodriguez asked Agredano to show him the text messages from Alegria suggesting that his sisters would come beat her up. (Dkt. No. 35-1 at 15–16). Agredano did not present that message. Instead, Agredano showed Officer Rodriguez screenshots of text messages indicating Alegria's cousins were planning to go to Agredano's house and cover the security cameras with paper plates. (Dkt. Nos. 5-1 at 22:27:45–22:28:11; 35-1 at 16). Agredano then gave the phone to Officer Rodriguez so he could review her text messages telling Alegria to give her phone back or she would contact the police. (Dkt. Nos. 5-1 22:28:18–22:34:10; 35-1 at 16–18).

Upon reviewing Agredano's messages, Officer Rodriguez discovered messages Agredano sent to Alegria after he had already retrieved his belongings, in which

Agredano stated she would sell his shoes. (Dkt. Nos. 5-1 at 22:34:52–22:35:08 CDT; 35-1 at 18). When questioned about the message, she explained that she sent it because she wanted her phone back. (Dkt. Nos. 5-1 at 22:34:52–22:35:08; 35-1 at 18–19). The exchange also revealed that Alegria had repeatedly told her to leave him alone; something Officer Rodriguez noted could constitute harassment. (Dkt. No. 5-1 at 22:35:34–22:35:58 CDT; Dkt. No. 35-1 at 18–22). Agredano maintained that she was only reaching out to recover the phone and would stop once it was returned. (Dkt. No. 5-1 at 22:35:34–22:35:58 CDT; Dkt. No. 35-1 at 21–22).

Officer Rodriguez began speaking with Alegria and his sister once again. They told Officer Rodriguez that Agredano threatened Alegria with a gun in a social media post if he did not return her phone. (Dkt. Nos. 5-1 at 22:37:07–22:37:13 CDT; 35-1 at 23–24). The post itself could not be produced because Agredano took the post down. (Dkt. Nos. 5-1 at 22:38:41–22:38:51 CDT; 35-1 at 23, 26). Alegria did, however, present messages Agredano sent him threatening that she would go to his grandma's house and "que van a hacer un desmadre" (that they are going to "raise hell"). (Dkt. Nos. 5-1 at 22:39:35–22:39:47 CDT; Dkt. No. 35-1 at 27). During this time, Agredano had been permitted to sit in her vehicle to charge her phone with the engine off. (Dkt. No. 20 at 3).

Officer Rodriguez returned to Agredano and informed her that her messages to Alegria about raising hell at his grandmother's house constituted a threat. (Dkt. Nos. 5-1 at 22:40:35–22:40:58 CDT; 35-1 at 28). Further, he informed Agredano that her repeated texts to recover her phone after Alegria told her to stop texting him constituted harassment. (Dkt. Nos. 5-1 at 22:40:35–22:40:58 CDT; 35-1 at 28). Officer Rodriguez added that he knew Agredano deleted those messages before showing him the text messages earlier. (Dkt. No. 35-1 at 28). Officer Rodriguez then told Agredano that she could either return Alegria's property or she would be arrested. (Dkt. Nos. 5-1 at 22:40:51–22:41:07 CDT; 35-1 at 28–29). Agredano insisted she did not have the items and consented to a search of her home. (Dkt. Nos. 5-1 at 22:41:09–22:41:19 CDT; 35-1 at 29).

At this point, Agredano called her mother on the phone and said the police told her she would be arrested because she has Alegria's things, but that he is messing with her. (Dkt. No. 35-1 at 29). Upon hearing this conversation with Agredano's mother, Officer Rodriquez ordered Agredano to get out of her vehicle. (Dkt. Nos. 5-1 at 22:41:36–

22:41:41 CDT; 35-1 at 29–30). Agredano did not comply and instead questioned why she needed to step out of the vehicle. (Dkt. Nos. 5-1 at 22:41:36–22:41:42 CDT; 35-1 at 29–30). Officer Rodriquez then informed Agredano that she was under arrest. (Dkt. No. 35-1 at 30). Agredano stated that she wanted to wait for her mother to arrive. (Dkt. Nos. 5-1 at 22:41:46–22:41:50 CDT; 35-1 at 30). She remained seated in the vehicle and refused to exit. (Dkt. No. 5-1 at 22:41:55–22:42:18 CDT). Agredano called her mother once again and told her to hurry because the officer told her to get out of the car. (Dkt. No. 35–1 at 30). Agredano's mother told Agredano to tell Officer Rodriguez that she was headed over. (*Id.*). Officer Rodriguez stated that he did not have to wait for anyone. (*Id.*) Officer Rodriguez then repeatedly ordered Agredano to get out of the car and warned that she would face an additional charge for resisting arrest if she did not comply. (Dkt. Nos. 5-1 at 22:42:20–22:42:34 CDT; 35-1 at 30–31).

Approximately fifty-nine seconds later, as Agredano remained in her vehicle despite orders to exit, Officer Rodriguez physically removed her from the vehicle, causing both Agredano and Officer Rodriguez to fall to the ground. (Dkt. No. 5-1 at 22:42:35–22:42:45 CDT). Agredano shrieked as Officer Rodriguez removed her from the vehicle. (*Id.* at 22:42:40–22:42:55 CDT). Agredano describes her removal from the vehicle as being "violently yanked" and thrown to the ground with such force that she and Officer Rodriguez were "propelled to the ground." (Dkt. No. 20 at 4). Agredano's amended complaint alleges that, some point while on the ground, Officer Rodriguez began striking Agredano with a closed fist and stated, "Stop resisting" and "What the f*** is wrong with you?" to Agredano. (Dkt. Nos. 20 at 4; 5-1 at 22:42:46–22:43:00 CDT). He then turned her onto her stomach and handcuffed her. (Dkt. No. 20 at 4). Agredano continued to scream and told Officer Rodriguez to "go away" and to stop touching her. (Dkt. No. 35-1 at 31). Officer Rodriguez then lifted Agredano off the ground and escorted her to the police car. (Dkt. Nos. 20 at 4; 5-1 at 22:43:00–22:43:35).

Agredano alleges that visible injuries appeared almost immediately following her arrest, including swelling on her forehead, lacerations, and bruising on her arms. (Dkt. No. 20 at 4). She was transported to the Laredo Police Department holding area for processing just after 11:00 p.m., where she later vomited and experienced vaginal bleeding. (*Id.* at 5). She requested to speak with a supervisor, and she alleges that her

requests went unaddressed. (*Id.*). Neither Agredano's pleadings nor the incorporated exhibits allege that Agredano requested medical treatment from Officer Rodriguez or that she ever told Officer Rodriguez that she was pregnant. At approximately 3:00 a.m., she was transported to the hospital by a different police officer after he realized that she had not had a "medical clearance" while in the holding area. (*Id.*). That same police officer spoke with Officer Rodriguez about why a "medical clearance" was not obtained for Agredano based on her injuries. (*Id.*).

At Laredo Medical Center, Agredano immediately complained of "severe" suprapubic and pelvic pain with vaginal bleeding due to "traumatic arrest police custody." (*Id.*). She suffered a severe contusion to her forehead along with lacerations and bruising to both her arms and legs. (*Id.*). Doctors suspected Agredano had suffered a miscarriage of her pregnancy. (*Id.*). On August 23, 2023, Agredano was formally diagnosed with the miscarriage. (*Id.*). She was also diagnosed with Post-Traumatic Stress Disorder (PTSD) and traumatic brain injury. (*Id.*).

### B. Procedural History

Agredano filed the present action against Officer Rodriguez on July 25, 2025. (Dkt. No. 1). Officer Rodriguez filed a motion to dismiss Agredano's original complaint on August 20, 2025. (Dkt. No. 5). Officer Rodriguez further filed a notice of filing a Rule 11 Motion for Sanctions on September 16, 2025. (Dkt. No. 10). On September 24, 2025, Agredano filed an opposed request for leave to file her First Amended Complaint. (Dkt. No. 15). On November 26, 2025, Magistrate Judge Diana Song Quiroga granted Officer Rodriguez's Rule 11 Motion for Sanctions in part and granted Agredano's request for leave to file an amended complaint. (Dkt. No. 19).

On November 26, 2025, Agredano filed her First Amended Complaint, the operative complaint in this action. (Dkt. No. 20). Officer Rodriguez filed a motion to dismiss Agredano's First Amended Complaint on December 10, 2025. (Dkt. No 22). On July 16, 2026, this Court held a hearing on Officer Rodriguez's operative motion to dismiss. On July 24, 2026, the Court ordered the parties to file supplemental briefing on outstanding issues relating to Agredano's wrongful death claim by August 7, 2026. (Dkt. No. 38). On August 7, 2026, Officer Rodriguez filed supplemental briefing on Agredano's wrongful death claim. (Dkt. No. 39). On August 10, 2026, Agredano filed supplemental

briefing on her wrongful death claim, a request for leave to file supplemental briefing late, and a request for leave to withdraw her wrongful death claim and clarify the damages she seeks in a new amended complaint. (Dkt. No. 40).

## II. LEGAL STANDARDS

### A. Motion to Dismiss under Rule 12(b)(6)

For a plaintiff to survive a motion to dismiss, their complaint must "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. et. al. v. Twombly*, 550 U.S. 544, 570 (2007)). To have facial plausibility, a plaintiff must have well-pleaded facts that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The complaint "is to be construed in a light most favorable to the plaintiff, and the allegations contained therein are to be taken as true." *Oppenheimer v. Prudential Sec., Inc.*, 94 F.3d 189, 194 (5th Cir. 1996). While all well-pleaded facts in the complaint are to be accepted as true, legal conclusions "are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. A court should "not strain to find inferences favorable to the plaintiffs." *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005). Where a complaint fails to state a claim, the court should generally give the plaintiff a chance to amend before dismissing with prejudice, unless amendment would be futile. *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).

### B. Qualified Immunity

The doctrine of qualified immunity "protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Argueta v. Jaradi*, 86 F.4th 1084, 1088 (5th Cir. 2023). The Fifth Circuit Court of Appeals has further explained: "This immunity protects all but the plainly incompetent or those who knowingly violate the law. Accordingly, we do not deny immunity unless existing precedent places the constitutional question beyond debate." *Id.* (citation modified).

Qualified immunity shields government officials from 42 U.S.C. § 1983 liability unless their conduct violates a constitutional right that was clearly established at the time of the alleged misconduct. *Zorn v. Linton*, 607 U.S. 568, 571 (2026); *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003) (citing *Harlow v. Fitzgerald*, 457 U.S. 800,

818 (1982)); *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Zorn*, 607 U.S. at 572 (citation modified).

"A right is not clearly established if existing precedent does not place the constitutional question beyond debate." *Id.* "To find that a right is clearly established, courts generally 'need to identify a case where an officer acting under similar circumstances ... was held to have violated' the Constitution." *Id.* (quoting *Escondido v. Emmons*, 586 U.S. 38, 43 (2019) (per curiam)). "The relevant precedent must define the right with a 'high degree of specificity,' so that 'every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.'" *Id.* (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)). Officials "receive qualified immunity unless they could have read the relevant precedent beforehand and known that it proscribed their specific conduct." *Id.*

In this context, courts apply a two-step analysis to determine whether qualified immunity applies: (1) whether the plaintiff has alleged a violation of a constitutional right; and (2) whether the right was clearly established such that a reasonable official would have known the conduct was unlawful. *Mace*, 333 F.3d at 623–24 (citation omitted). Courts may address these prongs in any order. *Pearson*, 555 U.S. at 236.

"Even if the government official's conduct violates a clearly established right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable." *Wallace v. Cnty. of Comal*, 400 F.3d 284, 289 (5th Cir. 2005) (citation modified). "The defendant's acts are held to be objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the" plaintiff's asserted constitutional or federal statutory right." *Cozzo v. Tangipahoa Parish Council-President Gov't*, 279 F.3d 273, 284 (5th Cir. 2002) (citation modified).

### C. Section 1983 Claims

Section 1983 provides a private right of action for the deprivation of rights, privileges, and immunities secured by the Constitution or laws of the United States. 42 U.S.C. § 1983. In a Section 1983 suit, law enforcement officers may be sued in their individual and/or official capacities. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991). A person

may assert a Section 1983 claim against anyone who "under color of any statute, ordinance, regulation, custom, or usage, of any State," violates that person's constitutional rights. 42 U.S.C. § 1983. To state a claim under Section 1983, a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States, and (2) demonstrate that the alleged deprivation was committed by a person acting under color of law. *Anderson v. Valdez*, 845 F.3d 580, 599 (5th Cir. 2016).

## III. DISCUSSION

Agredano brings four claims against Officer Rodriguez under Section 1983: (1) unlawful arrest; (2) use of excessive force; (3) deliberate indifference to medical needs; and (4) wrongful death of behalf of her unborn child. (Dkt. No. 20 at 6–10). Upon order from the Court to file supplemental briefing, Agredano moved to withdraw her wrongful death claim on behalf of her unborn child and requested leave to again amend her complaint for the purpose of dropping her wrongful death claim and incorporating the physical and mental harm from the loss of her pregnancy in her damages sought under her excessive force, unlawful arrest, and indifference to medical needs claims. (Dkt. No. 40 at 3).

Officer Rodriguez moves to dismiss Agredano's unlawful arrest, excessive force, and deliberate indifference to medical needs claims because they fail to state a claim upon which relief may be granted, and because Officer Rodriguez is entitled to the protection of qualified immunity. (Dkt. No. 22 at 14–19). Further, Officer Rodriguez moves to dismiss Agredano's wrongful death claim on behalf of her unborn child for lack of subject-matter jurisdiction because Officer Rodriguez is immune under Tex. Civ. Prac. & Rem. Code § 101.106. (Dkt. No. 22 at 19–23).

### A. Agredano's Section 1983 Fourth Amendment Unlawful Arrest Claim

Agredano asserts a claim against Officer Rodriguez for unlawful arrest under 42 U.S.C. § 1983. Agredano alleges that the arrest was unlawful because Officer Rodriguez had no probable cause to arrest her for theft, harassment, or terroristic threat based on the facts known to him at the time. (Dkt. No. 20 at 8). Officer Rodriguez moves to dismiss this claim because Agredano does not plead facts sufficient to show her arrest was not supported by probable cause. (Dkt. No. 22 at 16). Further, Officer Rodriguez argues that Agredano's pleadings and the video evidence make clear that he had probable cause to

arrest Agredano for both harassment and terroristic threat. (*Id.* at 14–15).

A Section 1983 claim for unlawful arrest in violation of the Fourth Amendment requires Agredano to sufficiently plead that she was unreasonably seized. The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *District of Columbia v. Wesby*, 583 U.S. 48, 56 (2018) (citation modified). Because arrests are "seizures of persons, they must be reasonable under the circumstances." *Id.* (citation modified). A warrantless arrest is reasonable "if the officer has probable cause to believe that the suspect committed a crime in the officer's presence." *Id.*

Probable cause requires that "the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed . . . an offense." *United States v. Levine*, 80 F.3d 129, 132 (5th Cir. 1996). To decide whether an officer had probable cause for an arrest, courts examine "the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Wesby*, 583 U.S. at 56−57. Further, because probable cause "deals with probabilities and depends on the totality of the circumstances," it is "a fluid concept" that is "not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 57. It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* Further, probable cause still exists even when the actual offense is not "closely related" to the offense stated by officers as a reason for the arrest. *Devenpeck v. Alford*, 543 U.S. 146, 153−54 (2004).

The Court does not need to find probable cause for all charges for the arrest to be lawful. The existence of probable cause for any offense is sufficient to defeat a claim of false arrest, even if the offense giving rise to probable cause is different from "the offense identified by the arresting officer at the time of arrest." *Livingston v. Texas*, No. 22-40719, 2023 WL 4931923, at *3 n.3 (5th Cir. Aug. 2, 2023) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). If an officer has probable cause to believe that an individual has committed even a minor criminal offense in his presence, he may arrest the offender without violating the Fourth Amendment. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

Under Texas Law, a person commits harassment if the person, "with intent to harass, annoy, alarm, abuse, torment, or embarrass another, the person: . . . (2) threatens, in a manner reasonably likely to alarm the person receiving the threat, to inflict bodily injury on the person or to commit a felony against the person, a member of the person's family or household, or the person's property;" or "(7) sends repeated electronic communications in a manner reasonably likely to harass, annoy, alarm, abuse, torment, embarrass, or offend another." Tex. Penal Code § 42.07.[5] "Electronic communication" means a transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo-optical system. *Id*. The term includes communication initiated by electronic mail, instant message, network call, or facsimile machine. *Id*.

Agredano alleges in her complaint that "there was no evidence other than the ex-boyfriend's bald complaint to substantiate any of the charges." (Dkt. No. 20 at 4). The body camera footage incorporated by Agredano in her First Amended Complaint, and the accompanying transcript and translation, contradict her allegation. The video footage reflects that Agredano handed her phone to Officer Rodriguez so he could read her messages with Alegria. (Dkt. Nos. 5-1 22:28:18–22:34:10 CDT; 35–1 at 16–18). While reviewing the text messages, Officer Rodriguez saw repeated messages from Agredano to Alegria, after Alegria told her multiple times to leave him alone. (Dkt. Nos. 5-1 at 22:35:35–22:36:15 CDT; 35-1 at 19). Officer Rodriguez then explained to Agredano that her repeated texting Alegria to return the phone after he had told her to stop texting him constituted harassment. (Dkt. Nos. 5-1 at 22:35:35–22:36:15 CDT; 35-1 at 21–22). Agredano responded that she would stop bothering Alegria once she gets the phone back. (Dkt. Nos. 5–1 at 22:35:35–22:36:15 CDT; 35–1 at 21–22). Officer Rodriguez informed Agredano repeatedly that she was harassing Alegria by repeatedly texting him to return the phone. (Dkt. Nos. 5–1 at 22:35:35–22:36:15 CDT; 35–1 at 22).

Agredano's pleadings and incorporated exhibits establish that a reasonable officer

[5] A conviction for harassment requires that the individual subjectively intended repeated electronic communications. *Wilson v. State*, 448 S.W.3d 418, 424 (Tex. Crim. App. 2014). Subjective intent may rely upon the circumstances surrounding a defendant's actions to prove her intent. *Id.* At a bare minimum, "repeated" can be satisfied with two communications. *See id.*

could have believed there was a probability or substantial chance Agredano committed harassment. Agredano's repeated texts, despite Alegria's responses telling her to stop texting him, could demonstrates the subjective intent required by the statute. Officer Rodriguez also observed numerous messages sent by Agredano to Alegria which could constitute repeated electronic communications under the statute. Alegria's responses indicate that he felt harassed: "leave me alone," "stop bothering me," and "I don't want to speak with you." Taken together, these facts established a fair probability that Agredano committed the offense of harassment in violation of Texas Penal Code § 42.07.

The facts alleged or incorporated into the First Amended Complaint also demonstrate that Officer Rodriguez had probable cause to arrest Agredano for terroristic threat. Under Texas law, a person commits the offense of terroristic threat if she "threatens to commit any offense involving violence to any person or property with intent to: . . . (2) place any person in fear of imminent serious bodily injury." Tex. Penal Code § 22.07.

Officer Rodriguez spoke with Alegria and reviewed the text conversation between Alegria and Agredano on his phone. During this process, Alegria showed Officer Rodriguez texts in which Agredano said she would go to his grandma's house and raise hell. (Dkt. No. 35-1 at 27). Officer Rodriguez then returned to Agredano, informed her that he read the texts where she said she would go to his grandma's house and raise hell while telling Alegria to return the phone. (*Id.* at 28). Further, Officer Rodriguez told her that he knew she had deleted these texts before showing him the texts in her phone, and that her messages constitute both a threat and harassment. (*Id.*). Agredano alleged in her First Amended Complaint that Alegria primarily lived at his grandmother's house. (Dkt. No. 20 at 2). A reasonable officer under these circumstances could believe there was a probability or substantial chance that Agredano communicated a terroristic threat in violation of Tex. Penal Code. § 22.07. Officer Rodriguez could have reasonably believed a text of this nature, coupled with the repeated demands to return her phone, would place Alegria in fear of imminent serious bodily injury.

Viewing the pleaded facts in the light most favorable to Agredano, Officer Rodriguez had probable cause to believe that Agredano had committed both harassment and terroristic threat in violation of Texas law. Officer Rodriguez, prior to the arrest,

explained clearly that Agredano's texts constituted both harassment and terroristic threat. Agredano's arrest was not unlawful in violation of the Fourth Amendment because it was supported by probable cause.[6] Accordingly, Officer Rodriguez's motion to dismiss Agredano's Section 1983 Fourth Amendment claim for unlawful arrest is **GRANTED** and that claim is **DISMISSED.**

### B. Agredano's Section 1983 Fourth Amendment Claim for the Use of Excessive Force

Agredano asserts a Section 1983 Fourth Amendment claim for the use of excessive force. Agredano's First Amended Complaint alleges that Officer Rodriguez used excessive force on Agredano in four ways: (1) violently yanking Agredano from the car; (2) throwing Agredano to the ground; (3) punching Agredano with a closed fist; and (4) picking her up only by her arms after she was handcuffed. (Dkt. No. 20 at 4). Agredano asserts that the force used in all instances was excessive because she was at most passively resisting arrest, her arrest was not supported by probable cause, and she had a clearly established right to be free from this use of force.

For an excessive force claim, the relevant constitutional protection is the Fourth Amendment right to be free from unreasonable seizures. U.S. Const. amend. IV; *see also Pratt v. Harris Cty.*, 822 F.3d 174, 188 (5th Cir. 2016) ("When a plaintiff alleges excessive force during an investigation or arrest, the right at issue is the Fourth Amendment right against unreasonable seizures") (citation modified). To establish an excessive force claim, a plaintiff must show that (1) she suffered an injury, (2) resulting "directly and only from the use of force that was clearly excessive," and (3) "the excessiveness of which was clearly unreasonable." *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016). "Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on the 'facts and circumstances of each particular case.'" *Deville v. Marcantel*, 567 F.3d 156, 157 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Determining whether the force used was objectively unreasonable, courts look at

---

[6] Even assuming for the sake of argument that the facts pled do not establish probable cause for Agredano's arrest, Officer Rodriguez is nevertheless entitled to qualified immunity. Agredano has not submitted, and the Court is not aware of, legal authority acknowledging a clearly established right to be free from arrest after Officer Rodriguez read the text messages that Agredano sent to Alegria.

three factors, often referred to as the *Graham* factors: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *Westfall*, 903 F.3d at 547. As part of this analysis, courts can look at "the seriousness of injury to determine whether the use of force could plausibly have been thought necessary." *Westfall*, 903 F.3d at 549. Officers may also "consider a suspect's refusal to comply with instructions in assessing whether physical force is needed to effectuate the suspect's compliance." *Trammell v. Fruge*, 868 F.3d 332, 341 (5th Cir. 2017) (citation modified). Officers must assess "not only the need for force, but also the relationship between the need and the amount of force used." *Id.*

A determination that a plaintiff was "actively resisting arrest" can overcome a situation where the other two *Graham* factors weigh against an officer's use of force. *Solis v. Serrett*, 31 F.4th 975, 982-83 (5th Cir. 2022). In *Solis*, the plaintiff was stopped for traffic violation and ultimately arrested for public intoxication—a Class C misdemeanor. *Id.* at 982. The severity of the plaintiff's crime was relatively low, weighing against the officers. *Id.* The plaintiff was "wearing an evening dress with laced sandals and armed only with her cell phone," demonstrating she did not pose an immediate threat to the safety of the officers or other. *Id.* Two of the three factors weighed against the officers. Nevertheless, she was hostile and argued with the officers, accusing them of improper racial motivation, and pulled away when the officer asked for her phone. *Id.* at 982-83. The plaintiff also struggled against the officers as they grabbed her arms. *Id.* The Fifth Circuit acknowledged that backing away from and struggling against officers during an arrest amounts to actively resisting arrest. *Id.* This third factor—whether the plaintiff was actively resisting arrest—was the only factor weighing in favor of the officers. *Id.* at 983. This third factor, coupled with the measured pace with which the officers resorted to force, was sufficient for the Fifth Circuit to conclude that the officers' restraint of the plaintiff's arms and a brief takedown were not clearly excessive. *Id.* Further, the Fifth Circuit acknowledged that the first two factors—severity of the crime and threat posed to the safety of officers—are "less salient" than whether the plaintiff was actively resisting arrest. *Id.*; *Betts v. Brennan*, 22 F.4th 577, 582 (5th Cir. 2022).

The Fifth Circuit distinguishes between active and passive resistance of arrest.

*Solis*, 31 F.4th at 982. "[W]here an individual's conduct amounts to mere 'passive resistance,' use of force is not justified." *Trammell*, 868 F.3d at 341 (quoting *Hanks v. Rogers*, 853 F.3d 738, 746 (5th Cir. 2017)). The line at which passive resistance becomes active is not a clear one. *Id.*

Even where a plaintiff has pleaded sufficient facts to show that the force used against them was excessive in violation of the Fourth Amendment, the Court must then consider whether the officer is entitled to the protection of qualified immunity. *Bailey v. Ramos*, 125 F.4th 667, 681 (5th Cir. 2025). To overcome qualified immunity, the plaintiff must show that she had a clearly established right to be free from the force used against her under the circumstances. *Zorn*, 607 U.S. at 571–72.

**1. Constitutional Violation: Excessiveness of the Force Applied by Officer Rodriguez**

Agredano alleges Officer Rodriguez used excessive force against her when he "violently yanked" her from the vehicle, "threw her to the ground," punched her in the face with a closed fist, and lifted her by her arms after she was handcuffed. (Dkt. No. 20 at 6).

Applying the *Graham* factors, the first factor is the severity of the crime involved. *Graham*, 490 U.S. at 396. As previously found by the Court, Agredano's arrest was supported by probable cause, both for harassment and terroristic threat. Harassment under Tex. Penal Code § 42.07 and terroristic threat under Tex. Penal Code § 22.07 constitute Class A or Class B misdemeanors depending on the circumstances of each case. While these crimes are more serious than the offense in *Solis*, they are misdemeanors, and Officer Rodriguez initially had responded to what amounted to a dispute about the return of sneakers and a cell phone. The first factor—severity of the crime involved—weighs slightly against Officer Rodriguez.

The second factor assesses whether Agredano posed an immediate threat to officers or others. *Graham*, 490 U.S. at 396. Agredano sent Alegria harassing messages and a threat to raise hell at his grandma's house. Nevertheless, the pleadings and incorporated evidence, when viewed in the light most favorable to Agredano, do not suggest that she was armed or that she posed a threat to Officer Rodriguez or anyone else at the scene. *See Solis*, 31 F.4th at 982–83 (finding that an unarmed plaintiff that

made no move to threaten or attack officers did not pose an immediate threat). Agredano was sitting in her car with the engine off, after receiving Officer Rodriguez's permission to do so. (Dkt. No. 20 at 2–4). Officer Rodriguez did not believe it was necessary to restrain Agredano before the actual confrontation, and he allowed her to sit in her car unattended. Rodriguez obviously did not believe Agredano to be a threat to his physical safety. The second factor also cuts against Officer Rodriguez because the pleaded facts do not establish that Agredano posed a threat to the safety of Officer Rodriguez or others.

The third factor looks to whether Agredano actively resisted arrest or attempted to flee. *Graham*, 490 U.S. at 396. Officer Rodriguez ordered Agredano to step out of her car multiple times and she did not comply. Instead, Agredano responded by asking why she needed to get out of the car, insisting she was waiting until her mother arrived, and calling her mother twice. (Dkt. No. 35-1 at 30–31). Officer Rodriguez warned Agredano that she would be charged with resisting arrest as well if she did not step out of the car. (*Id.*at 31). Agredano remained in her car and told Officer Rodriguez to "Get away from me." (*Id.*). Officer Rodriguez then grabbed Agredano, violently removed her from the car, and threw her to the ground.[7] (Dkt. Nos. 5-1 at 22:42:40–22:42:55 CDT; 20 at 4). At this stage, when viewing the pleadings and incorporated evidence in the light most favorable to Agredano, she alleges that she offered only passive resistance, and the incorporated video evidence does not blatantly contradict that allegation. (Dkt. No. 20 at 6). As pled, Agredano was at most passively resisting arrest leading up to Officer Rodriguez's use of force.[8] *See Deville*, 567 F.3d at 167–69 (holding that a "rough extraction" resulting in a

---

[7] In her original Complaint, Agredano alleged a "lack of" resistance, and that she "never . . . physically struggled." (Dkt. No. 1 at ¶¶ 14, 15). Rodriguez filed a motion for Rule 11 sanctions in which he argued that these statements, among others, blatantly contradicted the video evidence. (Dkt. No. 10–1). The Court determined that the body camera footage incorporated in Agredano's Complaint blatantly contradicted Agredano's pleadings. The Court referred Rodriguez's Rule 11 motion to Magistrate Judge Song Quiroga. Further, Judge Song Quiroga found that these allegations violated Rule 11 and sanctioned Agredano's counsel. (Dkt. No. 19 at 12–14). Agredano re-alleged these facts in her First Amended Complaint. (Dkt. No. 20 at 6–7). Having determined that these statements blatantly contradict the body camera video evidence incorporated by Agredano, the Court does not consider those alleged facts in analyzing Officer Rodriguez's motion to dismiss. Nevertheless, as discussed, the Court accepts as true Agredano's pleading that she was passively resisting arrest because the video evidence does not blatantly contradict this allegation. *Harmon*, 16 F.4th at 1163 (stating that a court may adopt facts from video evidence incorporated in a complaint where the video evidence blatantly contradicts the facts alleged.).

[8] The Court accepts Agredano's pleadings as true in assessing whether she was actively resisting arrest and whether excessive force was applied against her. The incorporated body camera footage and the transcription and translation do not provide clear evidence for the Court to assess on this issue.

forceful blow to the abdomen may constitute excessive force when removing a passively resisting plaintiff from a vehicle after the plaintiff does not comply with an order to exit the vehicle). This factor also weighs against Officer Rodriguez.

Agredano has sufficiently pled a claim that Officer Rodriguez used excessive force against her. The Court cannot determine with certainty at this stage whether the evidence in this case will ultimately show that the force used against Agredano was excessive in violation of her Fourth Amendment. Nor is it obligated to. Agredano alleges that Officer Martinez to "violently yanked" her from her car, forcefully threw her to the ground, began punching her, and picked her up by her arms while her hands were cuffed behind her back. (Dkt. No. 20 at 4). Agredano has adequately pleaded facts supporting that the force used against her was excessive in violation of her Fourth Amendment rights.[9]

### 2. Clearly Established Right

Officer Rodriguez asserts the defense of qualified immunity to the claim of excessive force in violation of the Fourth Amendment. Agredano argues that two cases demonstrate a clearly established right to be free from the type of force applied in the present case: *Trammell v. Fruge*, 868 F.3d 332 (5th Cir. 2017) and *Deville v. Marcantel*, 567 F.3d 156 (5th Cir. 2009). The Court analyzes whether Agredano had a clearly established right at the time of arrest to be free from Officer Rodriguez's excessive use of force in "violently yanking" her from her car, throwing her to the ground, punching her after she was on the ground, and lifting her by her arms once handcuffed.

---

[9] The Court recognizes the Fifth Circuit case, *Brothers v. Zoss*, in which the court held that forcibly removing a plaintiff who was passively resisting arrest from his car did not constitute excessive force. 837 F.3d 513, 519–20 (5th Cir. 2016). That case is distinguishable from the present case because: the court determined the offenses involved—driving while intoxicated and interfering with the duties of a public servant—were serious; the plaintiff was not given permission to remain in his car and was considered a threat to officers as long as he remained in his vehicle; and a reasonable officer could have reason to fear the plaintiff had a weapon in his vehicle. *Id.* at 519. Even though the suspect's resistance was passive, the other *Graham* factors supported a finding that the force used to remove the plaintiff from his vehicle was not excessive. *Id.* The *Brothers* case is distinguishable from the present case. The *Graham* factors, as discussed, lead the Court to the conclusion that the force used to "violently yank" Agredano from her vehicle did constitute excessive force. For example, Officer Rodriguez did not "slowly escalate[]" the amount of force used to remove Agredano from her car "until it was enough to extract" her. *Id.* Instead, as pled, Agredano was violently yanked from her car after being granted permission by Officer Rodriguez to sit in the car to charge her phone. The Court finds the facts and reasoning in *Deville* to be more analogous to the facts as pled by Agredano.

*Trammel* and *Deville* are both sufficiently analogous precedents such that they establish that the right violated by Rodriguez was clearly established on the date of the incident. For a right to be clearly established, "relevant precedent must define the right with a 'high degree of specificity,' so that 'every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.'" *Zorn*, 607 U.S. at 572 (quoting *Wesby*, 583 U.S. at 63). In *Deville*, the plaintiff was pulled over for a minor traffic violation, did not pose a threat or attempt to flee, and remained sitting in the running car. *Deville*, 567 F.3d at 167. The plaintiff refused to leave the vehicle when ordered to by officers. *Id.* Without engaging in much negotiation, officers pulled the plaintiff from the vehicle and threw her up against the vehicle, resulting in a blow to her abdomen area. *Id.* at 162. The court determined there was a dispute of material fact regarding whether the force used was clearly excessive under the circumstances. *Id.* at 169. Further, the Fifth Circuit determined that an individual has a clearly established right to be free from a "rough extraction," forceful blow to the abdomen, and handcuffs applied so tightly they cause nerve damage under the circumstances of a minor traffic stop, no attempt to flee, and passive resistance. *Id.* Agredano's situation is sufficiently analogous because, as alleged, Agredano was violently yanked from her vehicle, thrown to the ground, and punched by Officer Rodriguez. Further, Agredano's car engine was off, and she was sitting in the car with the permission of Officer Rodriguez. The clearly established right to be free from "rough extraction" after passively resisting arrest by refusing to exit the car is applicable to the facts as pled by Agredano.

In *Trammel*, the plaintiff resisted arrest by pulling his arm away from officers who were attempting to arrest him. *Trammel*, 868 F.3d at 341-42. The plaintiff was not aggressive and only moved his arm a few inches, never losing contact with the officers. *Id.* The officer responded by tackling the plaintiff to the ground within seconds. *Id.* The court held that a jury could conclude this tackle was excessive under the circumstances. *Id.* Further, the Fifth Circuit held that an individual has a clearly established right to be free from being tackled by several officers when the individual was not fleeing, not violent, not aggressive, and only barely resisted arrest by moving his arm a few inches. *Id.* at 343. While more distinct than the facts in *Deville*, *Trammel* still provides sufficiently analogous precedent to Agredano being forcefully thrown to the ground by

Officer Rodriguez.

Fifth Circuit precedent also clearly establishes a right to be free from punches, strikes, and violent slams when a suspect is not resisting arrest. *See Darden v. City of Fort Worth, Tex.*, 880 F.3d 722, 733 (5th Cir. 2018) ("a police officer uses excessive force when the officer strikes, punches, or violently slams a suspect who is not resisting arrest."); *Lozano v. Ortega*, No. EP-14-CV-239-KC, 2014 WL 6611595, at *6 (W.D. Tex. Nov. 19, 2014) ("the Fifth Circuit has held on numerous occasions that an officer violates clearly established Fourth Amendment law when he or she inflicts physical harm upon a suspect that is handcuffed or otherwise subdued."). As discussed, viewing the pleadings in the light most favorable to Agredano, she was passively resisting arrest when Officer Rodriguez began punching her. Fifth Circuit precedent provides that Agredano had a clearly established right to be free from this alleged use of force under the circumstances pled by Agredano.

Agredano has sufficiently pled a claim of excessive use of force that survives a qualified immunity defense. Accordingly, Officer Rodriguez's motion to dismiss Agredano's Section 1983 Fourth Amendment claim for excessive force is **DENIED**.

### C. Agredano's Section 1983 Fourteenth Amendment Claim for Deliberate Indifference to the Need for or Unreasonable Delay in Providing Medical Care

Agredano alleges that Officer Rodriguez was indifferent to her need for medical treatment in violation of her Fourteenth Amendment rights. (Dkt. No. 20 at 9). Officer Rodriguez moves to dismiss this claim because the pleadings do not establish that he had knowledge of Agredano's injuries or that she was pregnant. (Dkt. No. 22 at 18).

A detainee has a constitutional right, derived from the Due Process Clause of the Fourteenth Amendment, not to have their serious medical needs met with indifference. *Stapleton v. Lozano*, 125 F.4th 743, 749 (5th Cir. 2025). To successfully plead a claim for indifference to medical needs, a plaintiff must demonstrate that the officer: (1) subjectively knew of a substantial risk of serious harm; (2) responded to that risk with deliberate indifference; and (3) "substantial harm" resulted from that conduct. *James v. Smith*, 152 F.4th 594, 609 (5th Cir. 2025).

In the Fifth Circuit, an officer must have knowledge of a substantial risk of harm for liability to attach. *See James*, 152 F.4th at 609 (explaining that an official must both

be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference). Serious harm, in this context, must be "so apparent that even laymen would recognize that care is required." *Carmona*, *v. City of Brownsville*, 126 F.4th 1091, 1097 (5th Cir. 2025) (citation modified). Visible injuries may establish the officer's subjective awareness, but only when those injuries are so severe and obvious that the officer could not have missed their significance. *See Rogers v. Jarrett*, 63 F.4th 971, 976 (5th Cir. 2023). An officer's failure to immediately recognize ambiguous symptoms as a medical emergency does not amount to deliberate indifference, even if it might constitute negligence. *Stapleton,* 125 F.4th at 750. Deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm. *Id*.

A plaintiff alleging only that the defendant was aware that a potential for serious harm existed is not sufficient. *Carmona*, 126 F.4th at 1097. "Rather, 'the plaintiff must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Kelson v. Clark*, 1 F.4th 411, 417 (5th Cir. 2021) (quoting *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)) (citation modified).

Deliberate indifference is an extremely high standard to meet. *Stapleton*, 125 F.4th at 749. To show deliberate indifference, Agredano must plausibly allege that officers "'(1) w[ere] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and (2) actually drew the inference.'" *Carmona*, 126 F.4th at 1097 (quoting *Sims v. Griffin*, 35 F.4th 945, 949–50 (5th Cir. 2022)).

Agredano has not pleaded sufficient facts to establish that Officer Rodriguez had knowledge of her serious medical needs. Agredano alleges that she had visible swelling, bruising, and lacerations. (Dkt. No. 20 at 9). These injuries are not ones "so apparent that even laymen would recognize that care is required." *Carmona*, 126 F.4th at 1097. Agredano also pleads that she began vomiting and that she was bleeding through her clothing from the vaginal area. These signs could plausibly indicate a "serious harm" sufficient for a claim of deliberate indifference to medical needs. Nevertheless, Agredano does not allege that Officer Rodriguez had knowledge of these symptoms of Agredano's

pregnancy. Agredano alleges that she requested to speak with a supervisor, but that those requests were ignored by Officer Rodriguez. (Dkt. No. 20 at 9). Yet, she does not allege that she told Officer Rodriguez why she wanted to speak with a supervisor or, more specifically, that she wanted to talk to a supervisor about a serious injury or medical condition she was experiencing. While perhaps negligent, even when viewed in the light most favorable to Agredano, these allegations do not sufficiently plead that Officer Rodriguez had knowledge of Agredano's vomiting or vaginal bleeding.

Even assuming, *arguendo*, that Officer Rodriguez had knowledge of Agredano's serious injuries, it still does not establish that he was "deliberately indifferent." Deliberate indifference requires pleading both that Officer Rodriguez was aware of facts such that an inference of substantial risk of serious harm exists, and that Officer Rodriguez did draw that inference. Agredano has not alleged such facts.

The case law supports this conclusion. In *Dyer v. Houston*, the Fifth Circuit held that a reasonable jury could find deliberate indifference where officers witnessed a detainee repeatedly bash his head against the patrol car more than 40 times, failed to obtain medical attention, failed to inform jail personnel about the head trauma, and instead informed the jail that the detainee had been "medically cleared at the scene." 964 F.3d 374, 381–82 (5th Cir. 2020). In *Kelson v. Clark*, officers openly laughed at the plaintiff when he asked for medical attention after sustaining various head injuries. 1 F.4th at 414. By contrast, in *Carmona v. City of Brownsville*, despite officers being aware that the plaintiff was involved in multiple automobile collisions and had visible abrasions and contusions, the Fifth Circuit held that the facts at most showed officers should have known she was at risk for internal bleeding, not that they actively disregarded that risk. 126 F.4th at 1097.

Agredano pleads that she requested to speak to Officer Rodriguez's supervisor to voice complaints.[10] (Dkt. No. 20 at 9). This request, alone, does not demonstrate that Officer Rodriguez was aware of a substantial risk of harm or that he drew an inference

[10] Agredano's original complaint alleged that she complained of nausea and pain, and Officer Rodriguez refused to transport her to a hospital or provide her with other treatment for several hours after handcuffing him. (Dkt. No. 1 at ¶ 25). The Court granted Agredano leave to amend this allegation. (Dkt. No. 19 at 14–15). In her Amended Complaint, Agredano alleged only that she requested to speak with Officer Rodriguez's supervisor. (Dkt. No. 20 at 5, 9).

that Agredano was at risk of serious harm. Agredano relies on the fact that Officer Rodriguez failed to obtain a "medical clearance" as required by department policy, and that this delayed her treatment for four hours. A four-hour delay, without more, may reflect negligence in processing, but does not demonstrate that Officer Rodriguez consciously disregarded a known risk. *Garcia v. Fed. Bureau of Prisons*, 459 Fed. Appx. 458, 459 (5th Cir. 2012) (holding that the fact of a delay in itself is not sufficient to establish deliberate indifference).

Agredano alleges that another officer later asked Officer Rodriguez why clearance was not obtained. (Dkt. No. 20 at 9). Agredano does not plead facts demonstrating Officer Rodriguez's response, or any other fact demonstrating that Officer Rodriguez's failure was anything more than negligence. A policy violation, standing alone, does not establish deliberate indifference. *See Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388 (5th Cir. 2000) (explaining that failure to abide by an unwritten departmental policy evinces negligence at best, which is insufficient to support a finding of deliberate indifference).

Agredano fails to sufficiently plead a claim for deliberate indifference to medical need. Accordingly, Officer Rodriguez's motion to dismiss Agredano's Section 1983 Fourteenth Amendment claim for deliberate indifference to medical need is **GRANTED** and that claim is **DISMISSED.**

### D. Agredano's Section 1983 Claim for Wrongful Death of Unborn Child

In her Amended Complaint, Agredano pleads a Section 1983 wrongful death claim based on the death of her unborn child, alleging that Agredano suffered excessive use of force during her arrest, which caused her miscarriage. (Dkt. No. 20 at 10). Officer Rodriguez moved to dismiss that claim. On July 24, 2026, the Court ordered the parties to file supplemental briefing on the legal basis for Agredano's wrongful death claim. (Dkt. No. 38). Agredano filed her supplemental briefing late on August 10, with a request for leave to file late supplemental briefing. (Dkt. No. 40). Agredano's request for leave to file late supplemental briefing is **GRANTED.**

In her supplemental briefing, Agredano concedes that her wrongful death claim is not viable. (Dkt. No. 40 at ¶ 5). The Court finds that Agredano has voluntarily abandoned this claim. Officer Rodriguez's motion to dismiss Agredano's Section 1983 Claim for

Wrongful Death of Unborn Child is **GRANTED** and that claim is **DISMISSED.**

### E. Agredano's Request for Leave to Amend Complaint

Agredano seeks leave to amend her complaint to clarify her personal damages for the loss of her pregnancy as a result of Officer Rodriguez's alleged use of excessive force, unlawful arrest, and deliberate indifference to medical needs. (Dkt. No. 40 at ¶ 6–7). Rule 15(a) provides that leave to amend pleadings "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a)(2). While the Court has discretion as to whether to grant leave to amend, Rule 15(a) "evinces a bias in favor of granting leave to amend." *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 872 (5th Cir. 2000) (citation modified). Unless there is a "substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial." *Id.* (citing *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 (5th Cir. 1981)); *Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States of Am. Co.,* 195 F.3d 765, 770 (5th Cir. 1999).

Pursuant to this Order, the Court has dismissed Agredano's Section 1983 claims of deliberate indifference to medical needs, and unlawful arrest, but the Court has found that Agredano has sufficiently pleaded a claim for the use of excessive force that survives the defense of qualified immunity. Agredano has abandoned her claim for the wrongful death of her fetus, but she requests leave to replead her personal damages relating to the loss of her fetus, as an injury that resulted from Officer Rodriguez's alleged use of excessive force. The Court concludes that allowing Agredano to replead and clarify her damages is appropriate under Rule 15(a)(2). As such, Agredano is **GRANTED** leave to amend her complaint to remove the claims dismissed pursuant to this order, and to clarify the damages sought by her as a result of her remaining claim.

## IV. CONCLUSION

For the foregoing reasons, Officer Rodriguez's Motion to Dismiss Agredano's First Amended Complaint, (Dkt. No. 22), is **GRANTED** in part and **DENIED** in part. The motion to dismiss is **DENIED** as to Agredano's § 1983 Fourth Amendment claim for excessive force. The motion to dismiss is **GRANTED** as to the remainder of Agredano's claims.

Agredano's request for leave to file late supplemental briefing, (Dkt. No. 20), is **GRANTED.** Further, Agredano's request for leave to amend her complaint, (Dkt. No.

40), to remove the claims dismissed pursuant to this order and to clarify the damages sought from her remaining claim is **GRANTED**.

It is so **ORDERED**.

**SIGNED** on September 30, 2026.

John A. Kazen
United States District Judge